IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA

MDS INC. and MDS PHARMA )
SERVICES (US) INC., )
 )
    Plaintiff, )
 )
v. ) Case No.
 )
COVANCE INC. and NIGEL BROWN, ) **1 : 07 -cv- 0 455 -SEB -JMS**
 )
    Defendants. )

## COMPLAINT

Plaintiffs MDS Inc. ("MDS") and MDS Pharma Services (US) Inc. ("Pharma Services") ("collectively "Plaintiffs") hereby file the following Complaint against Defendants Covance Inc. ("Covance") and Nigel Brown ("Brown") (collectively "Defendants").

### INTRODUCTION

1. MDS and Pharma Services bring this action seeking all appropriate damages and equitable remedies arising out of the wrongful conduct of Brown, a former Pharma Services employee, and Covance, one of Pharma Services' primary competitors. Upon information and belief, Covance and Brown have misappropriated and used Plaintiffs' confidential, proprietary and trade secret information and have unlawfully usurped Pharma Services' business. Covance has committed these wrongful acts by hiring Brown, Pharma Services' highest-level strategic and corporate development executive, who had access to and has used Pharma Services' most highly confidential, strategic, corporate development and trade secret information relating to Pharma Services' business, the services that Pharma Services provides, and Pharma Services' strategic plans, negotiations, acquisition candidates, alliance partners and business direction.

51379939.3

Brown has committed these wrongful acts by violating his noncompetition and confidentiality agreements with MDS and Pharma Services and, upon information and belief, by unlawfully misappropriating, using, and disclosing to Covance MDS's and Pharma Services' confidential, proprietary and trade secret information.

## PARTIES

2. Plaintiff MDS is a corporation organized under the laws of the Province of Ontario with a principal place of business in Mississauga, Ontario, Canada.

3. Plaintiff Pharma Services is a corporation organized under the laws of Nebraska with a principal place of business in King of Prussia, Pennsylvania.

4. Defendant Covance is a corporation organized and existing under the laws of the State of Delaware. Its principal place of business is located in Princeton, New Jersey.

5. Defendant Brown is a citizen of New Jersey and currently resides in Princeton, New Jersey.

6. Brown is Covance's Vice President of Business Development and Strategy and works primarily in Covance's executive offices, located in Princeton, New Jersey.

## JURISDICTION AND VENUE

7. This Complaint is filed and the jurisdiction of this Court invoked pursuant to 29 U.S.C. § 1332(a)(1), (2) and (3) as the Defendants are citizens of different states than the Plaintiffs, and the matter in controversy exceeds $75,000.00, exclusive of interest and costs.

8. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(a) as Defendant Covance resides in this district, is subject to personal jurisdiction in this district, and has assented to venue in this district. In addition, Defendant Brown has assented to jurisdiction and venue in this district.

## STATEMENT OF FACTS

### Background

9. MDS is a global life sciences company that provides market-leading products and services that customers use for the development of drugs and diagnosis and treatment of disease. It is a leading global provider of pharmaceutical contract research, medical isotopes for molecular imaging, radiotherapeutics, and analytical instruments.

10. Pharma Services is a leading global contract research organization ("CRO") that provides drug discovery and development services, both early-stage and late-stage development, to pharmaceutical and biotech companies around the world. Pharma Services helps companies bring new drugs to market by applying scientific expertise to each stage of the drug discovery and development process through: identifying promising leads for new drugs; ruling out unpromising leads early in the process; conducting clinical trials to test the safety and effectiveness of new drugs; and navigating the drug regulatory environment.

11. MDS and Pharma Services have achieved, and will continue to maintain, their present competitive advantage by preserving the confidentiality of their competitively sensitive business development and strategic information, including, without limitation its: business strategy and direction, strategic initiatives, acquisition targets, strategic alliances, growth opportunities, marketing strategies; potential new service offerings; regulatory and quality assurance programs; bids and proposals for drug development services; costing, pricing and profitability, models and practices; current and future business plans; financial data; clients; key accounts; network of customers and potential customers; network of partners and potential target partners; and other strategic opportunities.

12. MDS takes great care to maintain the confidential and trade secret nature of such information by, for example, requiring employees to sign confidentiality agreements, requiring certain key employees to sign non-compete agreements, maintaining restrictive information technology systems and employing standards and procedures that limit information disclosure of confidential information to those employees who have a business-based need to know such information.

13. The need for confidentiality is particularly acute given the highly sensitive work involved on behalf of MDS's and Pharma Services' clients. If information about this work were disclosed, it would irreparably harm these clients' business interests in the highly competitive business of providing services to pharmaceutical and biotechnology clients.

14. If this information were to become available to a competitor or to become public knowledge, MDS's and Pharma Services' competitive advantage and the substantial investments they have made in developing their business strategy, marketing their services, and in developing and maintaining their relationships with clients, potential partners and acquisition targets would be irreparably injured and/or destroyed. Now, Covance has acquired and is continuing to use this very information by hiring MDS's and Pharma Services' key executive.

### Covance's Hiring of Brown

15. Brown began working for Phoenix International Life Services Inc. ("Phoenix") in or about September 1996. At that time, he signed a Confidentiality, Proprietary Rights, Regulatory Compliance and Non-Competition Agreement. This agreement, in part, prohibited Brown from competing with Phoenix for twelve (12) months following his termination of employment from Phoenix.

16. In or about February 1999, Brown executed an Employment Agreement for Senior Executive ("Senior Executive Agreement"). (A true and correct copy of Brown's Senior Executive Agreement is attached as <u>Exhibit A</u>.) This agreement includes a one-year restriction against engaging in competitive activity. Specifically, the Senior Executive Agreement provides:

> 7.1 In consideration of the grant of options referred to in article 11.5 hereof by PHOENIX, the Employee covenants and agrees that he or she shall not at any time within the period of one (1) year following the termination of his or her employment hereunder, on his or her own behalf or on behalf or on behalf of any person, whether directly or indirectly, in any capacity whatsoever, alone, through or in connection with any person, compete or be employed by a business which competes with the Business anywhere within Canada, the United States of America, the European Common Market or Switzerland.
>
> 8.1 In consideration of the grant of options referred to in article 11.5 hereof by PHOENIX, the Employee shall not, for a period of one (1) year following the termination of his or her employment, on the Employee's own behalf or on behalf of any person, whether directly or indirectly, in any capacity whatsoever, alone, through or in connection with any person for any purpose which is in competition, in whole or in part, with the Business:
>
> 8.1.1 solicit any Customer or aid, procure or assist in the soliciting of any Customer; or
>
> 8.1.2 accept, or aid, procure or assist in the acceptance of, any business from any Customer.

17. In or around June 2000, MDS acquired all of the stock of Phoenix and acquired ownership of the business, including all of the contracts into which it had entered with any of its employees.

18. Following that acquisition, Brown began working for Pharma Services as Senior Vice President, Preclinical Drug Development Services. In July 2003, Brown became Pharma Services' Senior Vice President, Strategic Planning, Technology, and Markets. In November 2004, he assumed the role of Senior Vice President, Strategic Business and Technology Planning.

19. As a condition of his employment with MDS and/or Pharma Services, Brown was required to abide by the terms of the Senior Executive Agreement MDS acquired from Phoenix and to sign an MDS employment agreement (the "MDS Agreement"). He signed the MDS Agreement on November 6, 2000. (A true and correct copy of the MDS Agreement is attached as Exhibit B.)

20. By signing the MDS Agreement, Brown recognized and acknowledged that certain material and information concerning the business of MDS and Pharma Services is highly confidential. He further acknowledged that he would not, at any time, divulge, use or misappropriate any information of a confidential nature that he acquired during his employment with MDS and/or Pharma Services.

21. In his positions as Senior Vice President, Strategic Planning, Technology, and Markets and Senior Vice President, Strategic Business and Technology Planning, Brown was responsible for designing, developing, communicating and implementing Pharma Services' strategic plan; sourcing and negotiating strategic initiatives; and identifying, evaluating and effecting acquisitions to grow the business and capabilities across all of Pharma Services' lines of business. He had intimate knowledge of the most confidential, potential strategic initiatives that Pharma Services planned or contemplated making, including, without limitation, potential service offerings, special programs, joint ventures, alliances, strategic investments, acquisitions, and divestitures. He was intimately involved in designing, developing and implementing all of the confidential short-term and long-term strategies for MDS and Pharma Services.

22. For instance, he founded, developed and led the Biomarker Alliance and other strategic initiatives. Through such strategic and developmental activities, he evaluated the strategic value of and engaged in confidential, strategic negotiations and developed important

relationships on behalf of Pharma Services with companies such as Radiant Research ("Radiant"), Gentris Corporation ("Gentris"), Caprion Pharmaceuticals, Inc. ("Caprion") and several others.

23. Through these discussions, on behalf of Pharma Services, and at substantial cost to Pharma Services, Brown developed and fostered important contacts at and learned and obtained highly confidential information about these and similar companies. He also learned and obtained confidential information about the strategic value of these and numerous other potential business partners.

24. Through the Biomaker Alliance, as a senior executive on Pharma Services' Senior Leadership Team for Global Early Stage Development Services, in the role of Senior Vice President, Preclinical Drug Development Services, and as Pharma Services' Senior Vice President, Business Planning, Technologies and Markets, Brown designed, developed and directed Pharma Services' strategic initiatives. He not only had access to all of Pharma Services' most confidential, proprietary and trade secret strategic business information; he used it on a regular basis in his business activities for Pharma Services.

25. For example, he evaluated merger and acquisition projects and managed and directed MDS's Biomarker Alliance initiatives, strategic initiatives and alliances, growth opportunities, marketing strategies; costing, pricing and profitability models; current and future business plans; financial data; clients, key accounts, networks of customers and potential customers; networks of partners and potential target partners; and other strategic opportunities.

26. With respect to sensitive acquisition targets, only a limited number of people have knowledge of or access to information regarding such targets. Such information is protected through Project Code Names and resides in limited access, password-protected e-

rooms or confidential files. The individuals directly involved in due diligence efforts also generally sign confidentiality agreements specifically related to those due diligence activities. Financial information and some strategy information are password-protected, and MDS and Pharma Services make significant efforts to limit the dissemination of this information.

27. As a Senior Vice President at Pharma Sevices and member of its senior leadership team, Brown had nearly unfettered access to Pharma Services' confidential and proprietary information and trade secrets. The types of information to which he had access included, but were not limited to, financial statements, strategic plans, marketing intelligence, business intelligence, sales strategy and presentations, pricing of products and services, product development, strategic direction of product development, and research studies.

28. He regularly reviewed, analyzed and worked with MDS's and Pharma Services' confidential and proprietary information and trade secrets and the confidential and proprietary information and trade secrets of each of Pharma Services businesses. Brown attended monthly meetings of the senior operations team at Pharma Services.

29. As a member of Pharma Services' senior management team, Brown participated in monthly meetings with senior executives from MDS and Pharma Services, including the Chief Executive Officer, the Chief Financial Officer, the Senior Vice President Human Resources of MDS, and the President, Chief Financial Officer and the other business unit heads and other executives from Pharma Services. In these meetings, confidential and strategic information about Pharma Services was discussed, along with similar information regarding other business units at MDS.

30. In preparing for and participating in these meetings, he reviewed, analyzed, discussed and distributed copies of confidential PowerPoint presentations that contained highly

sensitive, proprietary financial, customer marketing, business development, research and strategic information central to every facet of the strategic direction, service offerings and developmental objectives of Pharma Services and each of its businesses.

31. Pharma Services has invested significant sums of money over many years to develop the highly valuable, proprietary and confidential trade secrets possessed by Brown solely as a result of his employment with Pharma Services.

32. On May 22, 2006, Brown resigned his employment with MDS and Pharma Services and announced that he had accepted a position with Covance that would offer him greater responsibility and provide him with more compensation.

33. In the spring of 2006, as he was preparing to leave MDS and negotiating to join Covance, Brown was engaged the most highly confidential, sensitive and strategic discussions about the future direction for Pharma Services. He regularly met with the new president of Pharma Services and, with the executive team, he worked to design and develop a highly confidential, strategic four-year plan for Pharma Services. He also helped to prepare presentations relating to that strategic plan, while exploring avenues for growth and development. Thus, when he left Pharma Services to join Covance, he departed intimately familiar with, and fully armed with, Pharma Services' most current, sensitive, confidential and proprietary strategic and financial information.

34. Brown walked away from Pharma Services and joined Covance knowing every aspect of most of the confidential strategies for the businesses of MDS and Pharma Services. He also knew the intimate and confidential details about the ways in which Pharma Services intended to enhance its service offerings and improve its profitability through expansions and divestitures.

35. In addition, he knew confidential details about MDS's and Pharma Services' financial positions and their strategies for funding acquisitions and mergers and their internal usage of funds acquired through planned divestitures, reorganizations and restructurings.

36. Such plans involve a 36-48 month process. Accordingly, all of the knowledge and confidential information that Brown had and took with him when he resigned from Pharma Services remains highly relevant. Moreover, his knowledge of, ability to use and demonstrated use of that information has damaged and will continue to damage MDS in numerous respects.

37. In other words, on a daily basis, Brown used Pharma Services' proprietary, confidential and trade secret information of every nature and kind, and he was deeply involved in each and every one of the business units of Pharma Services. He inevitably took that information when he left Pharma Services, and he has used, and continues to use, that information since joining Covance.

38. Similarly, on a daily basis, Brown was intricately involved in Pharma Services' marketing plans; financial data; clients; key accounts; networks of customers and potential customers; networks of partners and potential target partners; network of strategic alliances and potential strategic alliances; and other strategic opportunities. He inevitably took that information when he left Pharma Services, and he has used, and continues to use, that information since joining Covance.

39. When Brown resigned from Pharma Services, he stated that he would maintain the highest professional integrity and would protect the proprietary, confidential and sensitive information to which he had been privy while working for Pharma Services. Based on these explicit representations, Pharma Services did not, at that time, pursue an action against Brown or

Convance for breach of contract, interference with contract or misappropriation of Plaintiffs' confidential, proprietary and trade secret information.

40. On information and belief, since leaving Pharma Services, Brown has engaged, on behalf of Covance, in strategic discussions with entities such as Gentris, Caprion and Radiant. These are entities with whom Brown had fostered and developed significant relationships while employed by MDS and with whom he had engaged in strategic discussion and negotiations on behalf of MDS.

41. After Brown joined Covance, Covance acquired eight early-phase clinical pharmacology sites from Radiant. These sites are competitive with the business of Pharma Services, and Brown had learned confidential information about Radiant when he engaged in negotiations and discussions with Radiant on behalf of MDS before resigning to join Covance.

42. After Brown joined Covance as a senior executive with extensive knowledge of Pharma Services' strategic plans and operations, Covance leveraged its acquisition of Radiant to compete against Pharma Services in the contract research area and to obtain significant business from one of Pharma Services' major customers.

43. Upon information and belief, in performing his business development and strategic job duties at Covance, Brown inevitably has used and disclosed confidential, proprietary and trade secret information that belongs to MDS and Pharma Services and that he acquired through his work at Pharma Services. In other words, upon information and belief, Brown has used, relied upon and disclosed proprietary, confidential, strategic financial and developmental information, clients, key accounts, networks of customers and potential customers, networks of partners and potential target partners, and networks of strategic alliances and potential strategic alliances that belong to MDS and Pharma Services.

44. On information and belief, Covance's purpose in hiring Brown was to obtain further confidential information and trade secrets relating to MDS's and Pharma Services' overall business strategies.

45. By virtue of his employment with Pharma Services, Brown helped develop and had access to MDS's and Pharma Services' most competitively sensitive and confidential information. This includes information relating to MDS's and Pharma Services' financial statements, strategic plans, marketing intelligence, business intelligence, sales strategy and presentations, pricing of products and services, product development, strategic direction of product development, and research studies.

46. On information and belief, within months after Brown joined Covance, Brown began to develop the strategic biomarker business at Covance and engaged in these efforts with full knowledge of and based on confidential and proprietary information that he had acquired at MDS.

47. On information and belief, MDS and Pharma Services allege that Covance and Brown improperly misappropriated MDS's and Pharma Services' confidential and proprietary information and trade secrets and improperly used and disclosed such information in connection with, among other things, establishing a biomarker business.

48. Moreover, Covance's recent allegations in the matter of <u>Covance, Inc. v. James Dixon and MDS Pharma Services, Inc.</u>, Case No. 1:07cv0409 LJM-WTL, which also is pending before this Court and with which the parties wish to consolidate this action (the "Dixon Litigation") demonstrate that Brown cannot perform services for Covance without inevitably using and disclosing Plaintiffs' confidential, proprietary and trade secret information.

49. In the Dixon Litigation, Covance alleges that James Dixon ("Dixon"), who held at Covance, and will hold at Pharma Services, a less senior position than Brown held at either Covance and/or Pharma Services, cannot work at Pharma Services without disclosing Covance's confidential and proprietary information and trades secrets.

50. In the Dixon Litigation, Covance maintains that it would suffer harm if Dixon were permitted to work for Pharma Services. Given the relative levels of responsibility in the roles held by Dixon and Brown, Covance's hiring of Brown must have caused and must be continuing to cause even more substantial harm to Plaintiffs in this action than Dixon's hiring has caused or could cause Covance. The role Dixon held at Covance principally involved global quality assurance responsibilities for Covance's Central Laboratory business. Brown's role at Pharma Services involved designing, developing, communicating and implementing Pharma Services' strategic plan and sourcing and negotiating strategic initiatives. Brown's day-to-day responsibilities, unlike Dixon's day-to-day responsibilities (which were limited to one of Covance's businesses) spanned each and every business unit at Pharma Services and involved the use of both MDS's and Pharma Services' most sensitive confidential, proprietary and trade secret information.

## COUNT I

### Breach of Contract v. Brown

51. The averments set forth in Paragraphs 1 through 50 hereof are incorporated by reference herein as if set forth in their entirety.

52. The Senior Executive Agreement that Phoenix entered into with Brown, and assumed by MDS, is valid, legally enforceable and supported by adequate consideration.

53. Pursuant to his Senior Executive Agreement with Phoenix, which MDS acquired when it purchased the stock of Phoenix, Brown agreed not to compete or be employed by a

business which competed "with the business of Phoenix, which the Senior Executive Agreement defined to be the business of a multi-service CRO which provides discovery, analytical services, preclinical studies, regulatory affairs services and scientific software products and services to pharmaceutical and biotechnology companies..." for a one-year period after the termination of his employment at MDS and/or MDS Pharma Services. Ex. A at §§ 7.1 and 2.9.

54. Brown has a contractual obligation to refrain form working for any MDS and/or Pharma Services competitor for a one-year period after the termination of his employment at MDS and/or MDS Pharma Services.

55. Covance is a competitor of MDS; accordingly, Brown's employment with Covance constitutes a violation of Paragraph 7.1 of the Senior Executive Agreement.

56. Unless Brown terminates his employment with Covance immediately, he will continue to violate his contractual obligations in the future.

57. As part of his MDS Agreement, Brown agreed that upon his leaving the employ of MDS and/or Pharma Services, he would not divulge MDS's or Pharma Services' confidential, proprietary and trade secret information.

58. On information and belief, in misappropriating such confidential proprietary and trade secret information, Brown has breached his contractual obligations to MDS and Pharma Services.

59. MDS has suffered, and continues to suffer, significant irreparable harm due to Brown's breaches of his contractual obligations.

## COUNT II

### Misappropriation of Trade Secrets v. Brown and Covance

60. The averments set forth in Paragraphs 1 through 59 hereof are incorporated by reference herein as if set forth in their entirety.

61. Brown has a common law duty not to misappropriate and disclose the trade secrets and confidential information of MDS and Pharma Services, and not to use or impart such trade secrets and confidential information for the benefit of anyone other than MDS and Pharma Services.

62. On information and belief, Covance's purpose in hiring Brown was to obtain further confidential information and trade secrets relating to MDS's and Pharma Services' overall business strategies.

63. On information and belief, MDS and Pharma Services allege that Covance and Brown improperly misappropriated MDS's and Pharma Services' confidential and proprietary information and trade secrets and improperly used and disclosed such information in connection with, among other things, establishing a biomarker business.

64. Based on Brown's job responsibilities at Covance, and his former responsibilities at MDS, Brown cannot possibly perform his responsibilities at Covance without disclosing MDS's and Pharma Services' trade secrets and confidential information. If Brown were to reveal MDS's and/or Pharma Services' confidential and proprietary business information to Covance, whether inadvertently or otherwise, it would be extremely harmful to MDS's and Pharma Services' competitive position in the marketplace.

65. MDS and Pharma Services have suffered and will continue to suffer damages as a result of such misappropriation.

66. Furthermore, on information and belief, Covance has not taken appropriate measures to prevent the misappropriation and disclosure of MDS's and Pharma Services' confidential and trade secret information.

## COUNT III

### Tortious Interference v. Covance

67. The averments set forth in Paragraphs 1 through 66 hereof are incorporated by reference herein as if set forth in their entirety.

68. By engaging in the conduct described above, Covance has unlawfully and without privilege engaged in unfair competition with and to the detriment of MDS in violation of state law.

69. On information and belief, in inducing Brown to misappropriate MDS's and Pharma Services' confidential property and trade secret information and in hiring Brown, Covance has tortiously interfered with MDS's and Pharma Services' contractual relationship with Brown and its advantageous business relations with Brown and others.

70. Covance has intentionally interfered with the contractual relationship between MDS and Brown.

71. MDS and Pharma Services has and continues to sustain damages as a result of such interference.

## COUNT IV

### Promissory Estoppel v. Brown

72. The averments set forth in Paragraphs 1 through 71 hereof are incorporated by reference herein as if set forth in their entirety.

73. When Brown resigned from MDS and/or Pharma Services, he promised he would maintain the highest professional integrity and would protect the proprietary, confidential and sensitive information to which he had been privy while working for Pharma Services.

74. Brown made these promises to prevent MDS and/or Pharma Services from enjoining him from working for Covance.

75. Based on Brown's explicit representations, MDS and Pharma Services did not, at that time, pursue an action against Brown or Covance for misappropriation of their confidential, proprietary and trade secret information and/or violation of Brown's contractual obligations to MDS and Pharma Services.

76. On information and belief, MDS and Pharma Services allege that Covance and Brown improperly misappropriated MDS's and Pharma Services' confidential and proprietary information and trade secrets and improperly used and disclosed such information in connection with, among other things, establishing a biomarker business.

77. MDS and Pharma Services have and continue to sustain damages as a result of such conduct.

## COUNT V

### Misrepresentation v. Brown

78. The averments set forth in Paragraphs 1 through 77 hereof are incorporated by reference herein as if set forth in their entirety.

79. When Brown resigned from MDS and/or Pharma Services, he promised he would maintain the highest professional integrity and would protect the proprietary, confidential and sensitive information to which he had been privy while working for Pharma Services.

80. Based on Brown's explicit representations, MDS and Pharma Services did not, at that time, pursue an action against Brown or Covance for misappropriation of their confidential, proprietary and trade secret information and/or violation of Brown's contractual obligations to MDS and Pharma Services.

81. MDS and Pharma Services have and continue to sustain damages as a result of such conduct.

WHEREFORE, MDS and Pharma Services pray for:

1. A permanent injunction, against Brown and Covance and all other persons or entities acting in concert with them or on their own behalf or participating with them as follows:

    a) enjoining Brown and Covance from, directly or indirectly using, disclosing or retaining any proprietary, confidential or trade secret information of MDS and/or Pharma Services;

    b) enjoining Brown and Covance from, directly or indirectly, engaging in any marketing, strategic or corporate development negotiations and/or discussions of any kind or nature that involve any of the following: acquisition targets with which Brown had any involvement or about whom Brown obtained any confidential information as a Pharma Services' employee; any of the strategic alliances or growth opportunities about which Brown obtained any confidential information as an employee of Pharma Services; any of the clients, key accounts, networks of customers and potential customers about whom Brown obtained any confidential information during his tenure as an employee of Pharma Services; or the network of partners and potential target partners or any other strategic opportunities about which Brown obtained any confidential information while working for Pharma Services.

    c) enjoining Brown and Covance from soliciting, inducing, recruiting, encouraging, assisting, advising or directing any individual who possesses or has access to MDS's and Pharma Services' proprietary, confidential or trade secret information to work for Covance;

        d)      enjoining Brown from being employed or continuing to be employed by Covance for such a period of time as is necessary to ensure that Brown does not disclose to Covance, or its use for its benefit, whether intentionally or inevitably, MDS's and Pharma Services' proprietary, confidential or trade secret information; and

        e)      enjoining Brown and Covance from taking any action to impair the goodwill or business reputations or good names of MDS and Pharma Services.

2.      A judgment in MDS's and Pharma Services' favor and against Brown and Covance for monetary damages, including, but not limited to, all amounts necessary to compensate MDS and Pharma Services for Brown's and Covance's wrongful activities including MDS's and Pharma Services' reasonable attorney's fees.

3.      A judgment in MDS's and Pharma Services' favor and against Brown and Covance for exemplary damages for its willful and malicious conduct.

        Respectfully submitted,

        MDS INC. and MDS PHARMA
        SERVICES (US) INC.,

        By their Attorneys,

        */s/ Melanie Harris*

        Michael A. Blickman
        Melanie E. Harris
        ICE MILLER LLP
        One American Square
        Suite 3100
        Indianapolis, IN 46282
        Melanie.harris@icemiller.com
        Michael.blickman@icemiller.com